**Barbara Dean BALDWIN, Appellant,**

v.

**STATE of Texas, Appellee.**

**Nos. 01–06–00859–CR, 01–06–00860–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

Feb. 7, 2008.

Rehearing Overruled March 14, 2008.

Discretionary Review Refused
Aug. 20, 2008.

Cary M. Faden, Sugar Land, TX, for Appellant.

Sherry Robinson, Kristen Moore, Assistant District Attorney, Lorretta Owen, John F. Healey Jr., District Attorney–Fort Bend County, John J. Harrity III, Assistant District Attorney, Richmond, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices ALCALA and BLAND.

## OPINION

JANE BLAND, Justice.

A jury found Barbara Dean Baldwin guilty of two charges of the first degree felony offense of injury to a child. Following her convictions, the jury assessed punishment at thirty and forty years' confinement for each charge, respectively. *See* TEX. PENAL CODE ANN. § 22.04 (Vernon

Supp.2007). On appeal, Barbara challenges the legal and factual sufficiency of the evidence supporting her convictions and the trial court's admission of testimony and a videotape concerning the victims' forensic interviews. Finding no error, we affirm.

## Background

R.D. and his younger brother, T.D., were born while their mother, Surrelia, was still a teenager. At first, they lived with their maternal grandmother. After a few years, their grandmother died, and the boys then went to live with their mother. She had a drug problem, however, and was unable to provide adequate care. When CPS intervened and investigated the boys' care, Surrelia agreed to let the boys live with her mother's sister, Barbara, and Barbara's husband, Tommy Baldwin.

Surrelia periodically had supervised visits with R.D. and T.D. at the CPS office. During one visit, Surrelia noticed marks on R.D.'s face. R.D. told her that he got the marks from sleeping on the garage floor where he had been sent to sleep as punishment for doing something wrong. When Surrelia reported this incident to CPS, the boys were removed from the Baldwin home and placed in foster care. But, after a few months, CPS returned the boys to the Baldwins. Soon after, Surrelia was convicted of theft and possession of a controlled substance and went to prison. During that time, she did not see her children.

According to R.D., who was fourteen years old at time of trial, he and his brother slept in the very back room of the Baldwin house. They would eat meals separately from the family, by the front door in the hallway. Most of the time, the Baldwins fed him sauerkraut, or rice and beans. Both boys qualified for free breakfast and lunch at school. At some point, Barbara began bringing the boys to school after breakfast time and taking the boys out of school at lunchtime and bringing them back after lunch. Barbara gave him either a sandwich or, if he got in trouble at school, sauerkraut as a "punishment food." R.D. recalled having a lot of problems at school.

R.D. testified that, while living with the Baldwins, he did not get enough to eat and was usually hungry. He was so hungry that he would take other people's food at school. After this happened, Barbara took the boys out of public school and homeschooled them. If R.D. did not complete his homework, he would not be allowed to eat. When asked if he ever ate things that people did not normally eat, R.D. testified that he had eaten dog food and cat food found in the garage, and feces. T.D. also testified that he and his brother had eaten garbage and dog food because they were not given enough to eat. R.D. recalled that when Tommy returned from work, he would see R.D. in the locked garage on his way into the house but did nothing to help him, other than to give him ice cream occasionally.

T.D. testified that if he did not complete his school work, Barbara would punish him by having him kneel and lift his arms over his head until he was allowed to get up. T.D. also recalled not getting enough to eat.

T.D. and R.D. did not get along. The Baldwins dealt with this by keeping the boys separated at night. One would sleep in the locked bedroom and the other would be locked in the garage to sleep there. They would switch back and forth. The Baldwins would give the boy in the garage a bucket instead of allowing him to use the bathroom inside.

When T.D. began attending public elementary school, he was evaluated as emo-

tionally disturbed and placed in special education. An elementary school administrator recalled that both boys had behavioral problems. When they got in trouble, it usually was for stealing food. The administrator also testified that when she discussed the boys' hunger with Barbara, Barbara continued to insist on bringing the boys home for lunch, even though free school lunch was available to them. She also began to bring the boys later to school, so that they would miss breakfast, which was also free.

One of R.D.'s elementary school teachers testified at trial. She stated that she did not think that R.D. had any behavior problems. She recalled that when Barbara came to the classroom, she would check R.D.'s desk and got upset with him if he had already eaten part of his lunch. After that, she began to take R.D. home for lunch. The teacher noticed that R.D. still seemed hungry when he came back to school, and she would occasionally share her lunch with him. T.D. likewise testified that the nurse and some of the teachers would share their food with R.D. and him. R.D.'s teacher also remembered a few occasions when R.D. had stolen food from others in the classroom. She further recalled that he was becoming noticeably thinner before Barbara withdrew him from school.

The elementary school nurse recalled that the boys appeared to be hungry and always wanted to eat. They would come to her office, and she would talk with them and give them snacks. The nurse met with Barbara when she took the boys out of school, and gave her a chart of the basic food groups. Barbara took the chart without comment. The nurse also testified that she would see the Baldwins at church. Sometime after Barbara removed the boys from school, the nurse saw the boys at church and noticed that R.D. appeared very thin, as if he were receiving chemotherapy or had cancer.

In late summer 2002, CPS received a referral concerning R.D. and T.D. The referral stated that the boys were not receiving proper nutrition and were being kept in the Baldwins' garage. When a CPS caseworker made contact with the boys, the caseworker brought them to the CPS office and gave them something to eat. After R.D. ate, his stomach began to hurt, and the caseworker brought him to Texas Children's Hospital emergency room.

Dr. Kathleen Motil, a board-certified pediatrician and board-certified pediatric gastroenterologist nutrition specialist at Texas Children's, was called into the emergency room to consult on R.D.'s case. Motil testified that R.D. was the most severely malnourished child she had seen in a long time. According to Motil, R.D. was suffering from severe protein calorie malnutrition, specifically of a combined kwashiorkor and marasmus type. She added that numerous other diagnoses, reflecting from the metabolic abnormalities of his body and resulting from the severe malnutrition, could also apply. These additional conditions suffered by R.D. included anemia, hepatitis, hypokalemia, and hypohosphatemia. Motil explained that these metabolic abnormalities were life-threatening conditions. For example, Motil explained, potassium is extremely important in heart function, so that abnormally low levels of potassium, such as those occurring in R.D., place malnourished children at risk of death.

As a result of the malnutrition, R.D. also was so constipated from the malnutrition that he had an extremely protuberant and hard abdomen. Motil diagnosed R.D. as having fecal impaction, which required treatment with an invasive procedure. Motil explained that R.D.'s condition was

consistent with his severely malnourished condition.

Also as a result of severe malnourishment, R.D. lacked muscle and fat mass and had a damaged kidney. To treat his malnutrition, R.D. was given as much normal food as he wanted as well as vitamin and mineral supplements. Motil noted that R.D. had a voracious appetite and that he hoarded food that he could not finish.

R.D. was discharged from the hospital after nine days, but was readmitted a little over a week later with an enlarged liver. Motil determined that R.D.'s liver had swollen because he was eating so much at his foster care placement that his starved body could not keep up. R.D.'s chest x-ray also showed an abnormal heart, which, Motil explained, related to R.D.'s poor nutritional status, lack of good muscle tone, and the beginning of correction of malnutrition by feeding. Motil testified that, while refeeding directly caused these abnormalities, starvation was their ultimate cause. Motil explained that she was able to rule out other possible causes because, by treating R.D. with a normal diet supplemented with vitamins and minerals, he was able to recover from the metabolic abnormalities, regain the weight he had lost, and catch up to a height and weight consistent with what would have been expected based on medical records of his growth from birth until he lived with the Baldwins.

Based on her diagnosis and observations, Motil ultimately concluded that, as a result of starvation, R.D. suffered serious bodily injury that created a substantial risk of death. Motil also opined that the permanent effects of starvation cause R.D. to suffer an increased risk of death in the future from hypertension, heart attack, or stroke.

Motil concluded that T.D., too, suffered from chronic malnutrition. During the time he lived at the Baldwins' house, T.D. lost thirty-one percent of his body mass. The pediatrician observed that T.D.'s larger size may have prevented him from suffering as severely from the condition as his brother. Nevertheless, the pediatrician concluded, the large amount of body mass lost by T.D. placed him in serious risk and his condition ultimately could have lead to his death. Once T.D. left the Baldwins' home and was placed in foster care, he grew over an inch in just a few weeks. A social worker who had observed T.D. testified that T.D. also showed signs of hoarding food and became very upset and agitated when he did not have free access to food.

## Discussion

### I. Legal and Factual Sufficiency Challenge

Barbara first contends that the evidence is legally and factually insufficient to support her convictions on each of the two counts. Specifically, she asserts that the evidence is legally and factually insufficient to support, beyond a reasonable doubt, a finding that she intentionally or knowingly caused serious bodily injury to the victims. Barbara contends that Dr. Motil's testimony shows that T.D. would only have suffered a substantial risk of death if he remained in the environment he was in, not that T.D. suffered serious bodily injury.

*Standard of review*

In evaluating the legal sufficiency of the evidence, we view it in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Drichas v. State,* 175 S.W.3d 795, 798 (Tex. Crim.App.2005). The standard is the

same for both direct and circumstantial evidence cases. *King v. State*, 895 S.W.2d 701, 703 (Tex.Crim.App.1995).

We do not weigh any evidence or evaluate the credibility of any witnesses, as this was the function of the trier of fact. *See Dewberry v. State*, 4 S.W.3d 735, 740 (Tex.Crim.App.1999); *Adelman v. State*, 828 S.W.2d 418, 421 (Tex.Crim.App.1992). Instead, we must determine whether both the explicit and implicit findings of the trier of fact are rational by viewing all the evidence admitted at trial in the light most favorable to the verdict. *See Adelman*, 828 S.W.2d at 422. In making this determination, we resolve any inconsistencies in the evidence in favor of the verdict. *Matson v. State*, 819 S.W.2d 839, 843 (Tex. Crim.App.1991).

In conducting a factual sufficiency review, we view all of the evidence in a neutral light. *Ladd v. State*, 3 S.W.3d 547, 557 (Tex.Crim.App.1999). Our factual sufficiency review must include a discussion of the most important and relevant evidence that supports the appellant's complaint on appeal. *Sims v. State*, 99 S.W.3d 600, 603 (Tex.Crim.App.2003). We will set aside the verdict only if (1) the evidence is so weak that the verdict is clearly wrong and manifestly unjust or (2) the verdict is against the great weight and preponderance of the evidence. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex.Crim.App.2000). We may not conclude that the evidence is factually insufficient simply because we disagree with the verdict. *Watson v. State*, 204 S.W.3d 404, 417 (Tex.Crim.App.2006). The fact finder alone determines the credibility of the witnesses and may choose to believe all, some, or none of the testimony presented. *Cain v. State*, 958 S.W.2d 404, 407 n. 5 (Tex.Crim.App.1997).

*Felony injury to a child*

The jury charge instructed the jury to convict Barbara if it determined from the evidence beyond a reasonable doubt that she intentionally or knowingly by act or omission caused serious bodily injury or *serious mental deficiency or impairment* to T.D. Barbara asserts no challenge to the legal or factual sufficiency of the evidence to show that she caused serious mental deficiency or impairment to T.D. Having failed to challenge that she caused serious mental deficiency of impairment to T.D., we hold the evidence is legally and factually sufficient to uphold the conviction for felony injury to a child. We further determine that the evidence is legally and factually sufficient to show that Barbara caused serious bodily injury to R.D. and T.D.

Injury to a child is a result-oriented offense requiring a mental state that relates not to the charged conduct but to the result of the conduct. *See Alvarado v. State*, 704 S.W.2d 36, 38 (Tex.Crim.App. 1985); *see also Stuhler v. State*, 218 S.W.3d 706, 718 (Tex.Crim.App.2007). It is not enough for the State to prove that the defendant engaged in the alleged conduct with the requisite criminal intent; the State must also prove that the defendant caused the result with the requisite criminal intent. *Lee v. State*, 21 S.W.3d 532, 540 (Tex.App.—Tyler 2000, pet. ref'd) (citing *Cook v. State*, 884 S.W.2d 485, 490 (Tex.Crim.App.1994)).

The fact finder may infer intent from the accused's acts and words as well as the surrounding circumstances. *See Ledesma v. State*, 677 S.W.2d 529, 531 (Tex.Crim.App.1984). A jury may reasonably infer that the defendant intentionally, not accidentally, inflicted the injury when the defendant fails to render aid known to be needed. *Tezino v. State*, 765 S.W.2d 482, 485 (Tex.App.—Houston [1st Dist.]

1988, pet. ref'd). A reasonable inference also arises in the presence of proof that the defendant tried to conceal the conditions that led to the victim's injuries. *Id.* at 485.

The jury heard evidence that both R.D. and T.D. lost weight and stopped growing during the three years they lived with the Baldwins, and had an opportunity to view photographs of the boys. The jury also heard testimony from Barbara that the boys suffered from persistent diarrhea for a three-year period. Barbara testified that she sent the boys to school wearing disposable diapers when they had diarrhea. Even while attributing the diarrhea to the fact that they ate dog food, she acknowledged the diarrhea was a problem. Yet, she admitted that T.D. had diarrhea for a year before she took him for a doctor visit, and her testimony was at odds with the doctor's recommendation, reflected in the medical records, that T.D. receive a high-fat, high-calorie diet. She also conceded that she took T.D. to the doctor only once during the three years the boys lived with her, and that she did not take R.D. to see a doctor for treatment at all.

Barbara also testified that the boys had good appetites, yet she prevented the boys from participating in the free breakfast and lunch programs at public school and eventually removed them from public school altogether as they became noticeably thinner and constantly sought food. She also punished the boys for eating at school when they were hungry and admitted to using "punishment food," such as sauerkraut, to discipline the children, even though she denied depriving them of adequate food. The attempts to conceal treatment of the boys, coupled with the testimony of the hospital pediatrician concerning the severity of their malnourishment, permitted the jury to reasonably infer that R.D. and T.D. suffered serious bodily injury because Barbara intentionally and knowingly failed to provide them with adequate nutrition and medical care. *See, e.g., Hill v. State,* 881 S.W.2d 897, 900–01 (Tex.App.—Fort Worth 1994) (holding that evidence was sufficient to support conviction for injury to child by food deprivation where evidence suggested that deprivation occurred over course of several years, victim's growth chart had flat-lined, parents ate normal food separately from children and punished victim for attempting to take food from kitchen when hungry, and victim was restrained to prevent him from obtaining food without permission and essentially died of starvation), *aff'd,* 913 S.W.2d 581 (Tex.Crim.App.1996). The jury need not have credited Barbara's testimony attributing the boys' malnutrition to emotional and behavioral problems. *See Dewberry,* 4 S.W.3d at 740. We disagree with Barbara that the three-year period of nutritional deprivation evidenced at trial is not legally and factually sufficient to support her convictions. Her failure to obtain medical attention or provide adequate food or nourishment in light of the boys' obviously malnourished condition and persistent diarrhea supports a reasonable inference that she consciously desired or was aware that her conduct was reasonably certain to cause the boys serious bodily injury, and such findings are not against the great weight and preponderance of the evidence.

## II. Evidentiary challenge

▋ Barbara next contends that the trial court erred in allowing Bonnie Martin, a forensic interviewer with Fort Bend County Children's Advocacy Center, testify about the outcry statements made to her by R.D. and T.D. and allowing into evidence videotapes of those statements. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Zuliani v. State,* 97 S.W.3d 589, 595 (Tex.Crim.App.2003). A reviewing court

should not reverse unless the record shows a clear abuse of discretion. *Id.; Roberts v. State,* 29 S.W.3d 596, 600 (Tex.App.— Houston [1st Dist.] 2000, pet. ref'd). An abuse of discretion exists only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree. *Zuliani,* 97 S.W.3d at 595; *Roberts,* 29 S.W.3d at 600.

Our review of the record reveals that Martin did not testify as an outcry witness. Although the State initially designated Martin as an outcry witness, she testified before the jury only to authenticate the videotapes of the interviews she conducted with R.D. and T.D. Defense counsel specifically informed the trial court that the defense had "no problem" with allowing the State to bring Martin as a witness for that purpose. Accordingly, we find no merit to Barbara's challenge to the admission of Martin's testimony.

## Conclusion

We conclude that the evidence is legally and factually sufficient to support the jury's findings of guilt on both counts of felony injury to a child against Barbara Dean Baldwin, and that the trial court did not abuse its discretion in admitting Martin's testimony. Finding no error, we affirm the judgments of the trial court.