Affirmed and Memorandum Opinion filed June 21, 2011.

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-10-00738-CR

___________________

 

Tamea Mingo, Appellant

 

V.

 

The State of Texas, Appellee



 



 

On
Appeal from the 182nd District Court

Harris County,
Texas



Trial Court Cause No. 1071665

 



 

 

MEMORANDUM OPINION

A jury convicted Tamea Mingo of injury to a child and
sentenced her to 36 years’ imprisonment.  On appeal, Mingo argues the evidence
was legally insufficient to support her conviction.  We affirm.

I

            On
April 5, 2007, Tamea Mingo called 911 seeking assistance for her 13-month-old
daughter, M.M.  Emergency personnel arrived within four minutes and found Mingo
and M.M., who was in cardiac arrest, alone in the apartment.  M.M.’s body was cold,
leading paramedics to believe she may have already been dead for some time.  However,
they attempted to revive her for forty-five minutes before ultimately transporting
her to West Houston Regional Hospital, where ER-physician Dr. Kenneth Totz
examined M.M. and pronounced her dead within minutes.  Among the numerous
injuries Dr. Totz found on M.M.’s body was a retinal hemorrhage, which he interpreted
as “clear and convincing evidence” of child abuse.[1] Dr. Totz
immediately alerted police.  

An ER nurse phoned Matthew Doyle, a senior forensics
nurse investigator, who came to the hospital and coordinated with Mingo and the
Houston Police Department to prepare M.M.’s initial death report.  Mingo told
Doyle, paramedics, ER physicians, and police officers the same story:  M.M.
injured herself by falling roughly two feet from a bed to the carpeted floor
while Mingo was in the shower.  Mingo claimed that M.M. appeared lethargic,
coming in and out of consciousness, and that Mingo spent at least ninety
minutes monitoring and running water over M.M. before calling 911.  Doyle
photographed M.M.’s body and noted contusions on either side of M.M.’s face,
inconsistent with the single fall Mingo suggested.  

Dr. Kathryn Haden-Pinneri performed M.M.’s autopsy the
following day and found thirty-six bruises at various stages of healing and
indicative of separate impacts.  Dr. Haden-Pinneri also found twenty scars,
including several consistent with cigarette burns and a large scar on the
bottom of M.M.’s foot, characteristic of a healed third-degree burn.  A
somewhat older injury showed that part of M.M.’s gums had been pulled away from
the underlying bone in her mouth.  The autopsy indicated five skull fractures,
with the most recent occurring around the time of death.  Dr. Haden-Pinneri
also found signs of present and past blood in the brain, including blood
beneath the soft spot, which is extremely rare in infants.[2]  M.M.’s skull
should have fused within thirteen months but failed to do so due to repeated
brain trauma.[3] 
M.M.’s cause of death was blunt trauma to the head, and Dr. Haden-Pinneri
specified that the injuries were “inconsistent with an accidental fall or anything
other than inflicted trauma.” 

On April 7, Mingo spoke with Sharon Ballard, the
special investigator for Child Protective Services assigned to M.M.’s case, and
offered the same explanation of M.M.’s injuries.  Ballard also suggested M.M.’s
injuries were inconsistent with Mingo’s story and further noted Mingo’s ninety-minute
delay between M.M.’s initial symptoms of head trauma and Mingo’s 911 call
constituted a violation of Mingo’s statutory duty to care for her child.[4]

However, at trial Mingo testified that her initial
story was a lie fabricated out of fear of a man she knew named Andy Minota. 
She testified that Minota would come “in and out” of her apartment and
physically abuse her and her seven children.  On the evening of April 4, 2007, Mingo
testified, Minota hit her while she held M.M. and caused them both to fall to
the carpeted floor.  Mingo also testified that M.M. fell again on the following
day, this time from a cabinet to the kitchen floor, and went limp, at which
point Mingo immediately called 911.  The record contains conflicting testimony
regarding how much time actually elapsed between M.M.’s injury and the 911
call.

II

A

            In a legal-sufficiency
review, we examine all the evidence in the light most favorable to the verdict
to determine whether a rational trier of fact could have found the essential
elements of the offense beyond a reasonable doubt.  Jackson v. Virginia,
443 U.S. 307, 319 (1979).  This standard of review applies to cases involving
both direct and circumstantial evidence.  Clayton v. State, 235 S.W.3d
772, 778 (Tex. Crim. App. 2007).  Although we consider everything presented at
trial, we do not substitute our judgment regarding the weight and credibility of
the evidence for that of the fact finder.  Williams v. State, 235 S.W.3d
742, 750 (Tex. Crim. App. 2007).  We presume the jury resolved conflicting
inferences in favor of the verdict, and defer to that determination.  Clayton,
235 S.W.3d at 778.  We also determine whether the necessary inferences are
reasonable based upon the combined and cumulative force of all the evidence
when viewed in the light most favorable to the verdict.  Id.  

The State’s indictment charged Mingo with
intentionally and knowingly causing serious bodily injury to M.M. by striking
her with or against a deadly weapon and failing to seek immediate medical
attention when M.M. displayed symptoms of head trauma.  A person commits a
first-degree felony if she intentionally or knowingly, by act or omission,
causes to a child a serious bodily injury.  Tex. Penal Code § 22.04(a)(1), (e).  A fact finder
must almost always infer a defendant’s mental state from circumstantial
evidence.  See Moore v. State, 969 S.W.2d 4, 10 (Tex. Crim. App. 1998)
(“A defendant’s mental state ‘was concealed within his own mind and can only be
determined from his words, acts, and conduct.’”) (citation omitted); see
also Gant v. State, 278 S.W.3d 836, 839 (Tex. App.—Houston [14th Dist.]
2009, no pet.).  A criminal defendant’s post-incident statements about the
cause of an infant’s injuries can indicate a consciousness of guilt, especially
when grossly inconsistent with the medical findings.  Baldwin v. State,
264 S.W.3d 237, 242–43 (Tex. App.—Houston [1st Dist.] 2008, pet. ref’d);
Barcenes v. State, 940 S.W.2d 739, 745 (Tex. App.—San Antonio 1997, pet
ref’d).  A jury may also infer consciousness of guilt from a defendant’s
changing story about the crime and surrounding circumstances.  See Couchman
v. State, 3 S.W.3d 155, 163–64 (Tex. App.—Fort Worth 1993, pet. ref’d).  Further,
a jury may infer the defendant’s intent to cause the requisite harm from the
victim’s injuries, the method used to produce the injuries, and the relative
size and strength of the parties.  Patrick v. State, 906 S.W.2d 481, 487
(Tex. Crim. App. 1995).

B

Mingo argues the State offered no evidence of her
requisite mental state to prove that she intentionally or knowingly caused
serious bodily injury to M.M. by (1) striking M.M. with or against a deadly
weapon, or (2) failing to seek immediate medical attention when M.M. began to
exhibit symptoms of head trauma, including impaired consciousness.  

At trial, Mingo testified that her initial story
regarding the cause of M.M.’s injuries was a lie and offered a different
account of events.  Mingo’s original version suggested that M.M. injured
herself by falling from a bed while home alone with Mingo.  At trial, Mingo testified
that she lied out of fear of Minota and offered a new story, making her first
mention of Minota’s alleged involvement in M.M.’s injuries.  It was within the
jury’s discretion to assess Mingo’s credibility and choose to believe either,
neither, or parts of her explanations. 

We presume the jury interpreted the evidence in favor
of the verdict, concluding Mingo inflicted M.M.’s injuries.  See Clayton,
235 S.W.3d at 778.  A jury may have reasonably inferred Mingo’s consciousness
of guilt in light of her changed story.  See Couchman, 3 S.W.3d at
163–64.  In determining the credibility of her testimony, the jury also had
before it Mingo’s admission that her previous account of M.M.’s injuries was a
lie fabricated to conceal the actual events, as well as the testimonies of Drs.
Totz and Haden-Pinneri discrediting Mingo’s explanations of M.M’s injuries.  See
Baldwin, 264 S.W.3d at 242–43.  The doctors noted a number of scars,
bruises and fractures on M.M.’s body of which Mingo claimed to be generally
unaware, and the few explanations she offered were inconsistent with the doctors’
testimonies.[5] 


The evidence is undisputed that, when M.M. received
emergency medical attention, she was severely injured.  The examining
physicians consistently testified that some of M.M.’s injuries were inflicted around
the time of death, while others were significantly older.  The doctors’
testimonies highlighted that the nature of M.M.’s injuries strongly indicated
abuse—specifically due to the number of injuries at varying healing stages that
could only have been caused by substantial force.  Dr. Haden-Pinneri concluded
that M.M. died from recently inflicted blunt trauma to the head.  It follows
that the jury could have reasonably determined Mingo inflicted the trauma.

The jury was entitled to give weight to the doctors’
testimonies further illustrating that injuries of this severity can only be
inflicted with substantial force.  The jury could have reasonably inferred that
a person inflicting such extensive force on an infant knew she was reasonably
likely to cause and intended to cause severe bodily harm.  See Patrick,
906 S.W.2d at 487.  Therefore, the combined and cumulative force of all the
evidence when viewed in the light most favorable to the verdict supports
Mingo’s conviction for injury to a child.

Regarding Mingo’s alleged failure to seek immediate
medical attention when M.M. began exhibiting symptoms of head trauma, the jury
heard Mingo’s original story that she waited at least 90 minutes to call 911
after M.M. fell from the bed and began coming in and out of consciousness.  Doyle
and Ballard testified that, per separate discussions with Mingo, this period may
actually have been as long as several hours.  Paramedics arrived within four
minutes of the 911 call and reported M.M. appeared to have been dead for some
time.  At trial, Mingo testified that she called 911 immediately after M.M. fell
from a kitchen cabinet and began showing symptoms of an injury.  To support her
claim of insufficient evidence, Mingo points to Doyle’s testimony that he could
not determine whether Mingo was slow in getting help for her child.  However, Doyle
did not testify Mingo acted reasonably, only that he could not testify with
certainty that she acted unreasonably.  And even if he had testified Mingo
acted reasonably, the jury would not have been required to believe that
testimony.  The jury was entitled to assess the credibility of all the evidence
before it and reasonably concluded there was a delay between the time M.M.
began showing symptoms of head trauma and the time Mingo called 911, and this
delay was long enough to constitute a violation of Mingo’s statutory duty to
care for her child.  The evidence reasonably supports this conclusion.

Reviewing all of the evidence in the light most
favorable to the verdict, the combined and cumulative force of the direct and
circumstantial was sufficient to enable a rational jury to find beyond a
reasonable doubt that Mingo intentionally or knowingly caused serious bodily injury
to M.M. by striking M.M. with or against a deadly weapon, and by failing to
seek immediate medical attention when M.M. began to exhibit symptoms of head
trauma.  Therefore, the evidence is legally sufficient to support the jury’s
verdict, and we overrule Mingo’s issue.

* * *

We affirm the trial
court’s judgment.

                                                                        

                                                                        /s/        Jeffrey
V. Brown

                                                                                    Justice

 

 

 

 

Panel consists of Justices
Anderson, Brown, and Christopher.

Do
Not Publish — Tex. R. App. P. 47.2(b).









[1] Dr. Totz explained that a
retinal hemorrhage is bleeding on the back part of the eye.  He testified that
these injuries “are not a result of trivial falls in children . . .  [I]t takes
a lot of energy to cause this particular type of injury.”  Doctors are trained to
interpret retinal hemorrhages as “well-representative of abuse in children.”





[2] Dr. Haden-Pinneri
testified that, in her career, she had only seen blood on an infant’s brain
following severe car accidents and had never seen blood on the brain beneath
the soft spot under any circumstances.





[3] Dr. Haden-Pinneri
testified that the soft spot remained “because of repetitive or multiple
occasions of head trauma” which caused the brain to swell.  “[B]ecause her
skull is constantly needing to expand, this area can’t close . . . [so the soft
spot is] persisting longer than it should.”





[4] Tex. Fam. Code § 151.001.





[5] For example, Drs. Totz
and Haden-Pinneri determined the large scar on the bottom of M.M.’s foot was
consistent with a healed third-degree burn.  Dr. Haden-Pinneri noted this must
have been inflicted, as M.M. could not walk.  Mingo testified that the scar
resulted from a healed blister.