

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-14-00224-CR

---

FRANJESSICA WILLIAMS, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 282nd District Court
Dallas County, Texas
Trial Court No. F-1400534-S

---

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Burgess

# M E M O R A N D U M   O P I N I O N

Franjessica Williams was convicted by a Dallas County jury of knowingly causing serious bodily injury to a child by omission[1] and sentenced to fifty years' confinement in the Correctional Institutions Division of the Texas Department of Criminal Justice. Williams claims on appeal[2] (1) that there is insufficient evidence to support her conviction, (2) that the trial court erred in instructing the jury regarding good-conduct time, and (3) that the trial court lacked jurisdiction to render a judgment in this case because it was not transferred to its docket. Since we find that the trial court had jurisdiction, that there was sufficient evidence to support Williams' conviction, and that Williams has presented no error in the trial court's instructions to the jury, we affirm the trial court's judgment.

## I.      Background

Around 6:16 on the morning of June 26, 2013, Williams arrived at Medical City Hospital in Dallas with her two-and-one-half-year-old son, J.L. Rather than taking him to the emergency room, Williams inexplicably presented J.L. for treatment at the radiology suite. J.L. was pale, cold, grayish, and stiff by the time Dr. Mini Delashaw, an emergency room physician, arrived. He was not breathing and unresponsive, and although Delashaw attempted to insert a breathing tube, she could not open his mouth since rigor mortis had already set in. At 6:23 a.m., Delashaw pronounced J.L. dead. At trial, Delashaw testified that J.L. had bruises across his head, chest,

---

[1]*See* TEX. PENAL CODE ANN. § 22.04(a)(1), (e) (West Supp. 2014).

[2]Originally appealed to the Fifth Court of Appeals in Dallas, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). We follow the precedent of the Fifth Court of Appeals in deciding this case. *See* TEX. R. APP. P. 41.3.

abdomen, and legs and ligature marks on his wrists and ankles. She explained that ligature marks occur when a person who has been tied down with something pulls against it. Delashaw also testified that when she asked Williams what had happened, Williams said that she found him at the bottom of the stairs tangled up in bands or string and that she was upset with him the night before. When Delashaw told her J.L. was dead, Williams began beating him on the chest.

Williams was interviewed at the hospital by Dallas Police Department detectives Brianna Valentine and Corey Foreman. Williams told the detectives that the day before, J.L. had been throwing temper tantrums and that she had spanked him with her hand and a switch three or four times. She had tried to put him in time-out, but each time he would get out. She claimed that she put him in his playpen around 11:00 p.m. with the side down so he could go to the bathroom. After putting him in the playpen, she went downstairs to eat and decided not to feed J.L. until the next day. She went to sleep and sometime during the night, she heard a loud noise that sounded like kicking, but just thought he was throwing another tantrum. Williams said she awoke about 6:00 a.m. and found J.L. at the bottom of the stairs with both hands and both feet tangled up in ribbon. Valentine testified that since Williams' explanation did not explain the bruising on J.L., they obtained a voluntary consent from Williams, as well as a search warrant, to search her apartment.

While Foreman took Williams to the Children's Advocacy Center (CAC) to obtain a recorded statement, Valentine and another detective went to Williams' apartment to execute the search warrant. Valentine described the apartment as extremely hot and stuffy, which required

3

them to go outside to take breaks from the inside heat.[3]  She testified that there was only one playpen in the apartment, which was located upstairs in the only bedroom.  According to Valentine, the playpen contained two large plastic storage bins, was full of clothes, and was blocked, on the open side, by a night stand.  Although the detectives found a pink, measuring tape-style ribbon in the bathroom and the same style ribbon hanging down from a clothes bar in the closet, no ribbons were found at the bottom of the stairs.  In the closet, one of the detectives also found a folding chair with a belt run through the bottom part of the chair.

Foreman testified that after Williams admitted spanking J.L several times and seeing the injuries to the child, he asked Williams to come to the CAC to record a statement.  According to Foreman, Williams accompanied him and another officer, and after arriving at the CAC, Foreman gave Williams the *Miranda[4]* warnings.  A redacted version of the recorded interview was published to the jury.[5]  During her interview, Williams initially maintained her original story.  However, as the interview progressed, she admitted that she had only fed J.L. one sandwich in the two previous days and nothing the day before.  She also admitted that she had bound his hands and legs to a chair and had placed him in the upstairs closet, barricading him in with boxes and pillows.  She also admitted hitting his head against the wall and slapping his head during the course of the previous evening.  She stated that J.L. was whining and rolling his eyes when she took him upstairs to the closet, beginning about 6:00 p.m.  She also described how J.L. had a hard time standing up

---

[3]The evidence showed that the high and low temperatures for that day and the three prior days averaged 97.5 degrees Fahrenheit and 79 degrees Fahrenheit, respectively.

[4]*See Miranda v. Arizona*, 384 U.S. 436 (1966).

[5]Although Williams objected at trial to the admission of portions of the interview, no error is asserted on appeal.

4

or even sitting up, as though he was tired or drowsy. Williams explained that J.L., though bound, would collapse forward, and she would stand him back up. She said that he got out of the closet, and collapsed and his eyes rolled back in his head. When asked why she did not get medical attention for J.L., she stated that she was scared that once the doctors saw him, they would take him away from her. She admitted that she failed to get help for J.L. even though she knew something was wrong with him, and even though she thought about it. After the interview, Foreman placed Williams under arrest for injury to a child.

Recordings of two telephone calls made by Williams to her mother and grandmother while in jail were also published to the jury. In those telephone conversations, Williams stated that something told her it was dehydration, that they (she and J.L.) were both dehydrated, and that she was tired and frustrated the night before J.L.'s death. Her grandmother also discussed how Williams had been hospitalized a couple of times for dehydration before this incident, and Williams acknowledged how it was "real bad." Williams also stated that on the day before J.L.'s death, she and J.L. had been in a hot car, fighting, for an hour and that when they returned to the apartment, she put him in the closet. When asked why she did not have the air conditioner on in the car, she claimed she was trying to discipline J.L.

James Penny, a friend of Williams', testified that he saw J.L. the day before his death and that he did not see any bruises on his body. He testified that Williams worked two jobs and was able to provide for her son. He felt that Williams' expectations of J.L. were unreasonably high. Penny also testified that he had told Williams that she could not "whoop" J.L. and that Williams knew that was not the way to treat a baby. Although he encouraged her to use time in the corner

5

as discipline, Penny never encouraged Williams to use restraints on J.L. He also testified that Williams had taken J.L. to the doctor regularly in the past. In Penny's opinion, Williams, while not stupid, gets easily confused.

Felicia Ann McKay-Weaver, a speech language pathology assistant, worked with J.L. for about four months. She last saw him about four months before his death. When she began working with him, at about eighteen months old, J.L. was nonverbal. McKay-Weaver testified that she had shown Williams different strategies for working with J.L. She also expressed concerns to Williams over her apparent lack of understanding of J.L.'s developmental problems. McKay-Weaver testified that Williams' response to her concerns was to state that J.L. was cocky, arrogant, and thick headed. After McKay-Weaver fully explained his problems to her, Williams would say she understood, but at the next therapy session, Williams would have the same complaints about J.L.'s behavior.

Dr. Reade Quinton, the deputy chief medical examiner for Dallas County, performed an autopsy on J.L.'s body. She described in detail the multiple bruises, abrasions, and lacerations she found on the child. In addition, she testified that he had very little body fat, which, according to Quinton, indicated malnourishment on a child J.L.'s age. Quinton further testified that she found no metabolic disorder or disease that would explain his malnourishment. Quinton also testified that J.L. had ligature burns on his wrists and ankles, indicating that something had been tied around them. She also described the results of blood tests and a microscopic examination of the kidneys, which indicated that J.L. was dehydrated and malnourished. Based on her autopsy and information

that J.L. had been in an extremely hot closet overnight, Quinton determined that the causes of death were dehydration and hyperthermia.

Quinton further explained that if a person is dehydrated, he is more susceptible to hyperthermia. She testified that dehydration creates a substantial risk of death and that it can cause permanent damage to the kidneys and brain. Quinton also opined that adequate hydration would have prevented J.L.'s death and that if he had been taken to the hospital while still alive, it is likely his health could have been restored. Quinton testified that the first signs of dehydration are cracked lips, sunken eyes, and a wasted look, all of which she saw during the autopsy. She explained that eventually the person becomes lethargic, more and more unresponsive, and then unconscious. She testified that if someone described J.L.'s eyes rolling back in his head, that would mean he was becoming lethargic or about to pass out. Finally, Quinton agreed that an individual's ability to recognize the signs of dehydration depends on their education, life experience, and experience with children.

In the guilt/innocence phase of the trial, Williams called one witness, Kristi Compton, a forensic and clinical psychologist. Compton testified that Williams has an Intelligence Quotient of 81, indicating that she has borderline intellectual functioning and that she functions at the level of a twelve-year-old. She explained that an IQ score indicates how an individual copes with daily life, how that individual processes information, and whether that individual is able to make sound judgments. Compton also testified that Williams had been abused as a child, which contributed to her anger and inappropriate perceptions of events and her lack of parenting skills. Compton opined that Williams undoubtedly intended to hurt and punish J.L., but that she did not intend to, or was

7

not aware that her conduct would, kill J.L. or cause him serious bodily injury. Compton did concede, however, that Williams should have known her conduct would cause these results.

On cross-examination, Compton acknowledged that there was some awareness on Williams' part that failing to seek medical attention for J.L. and failing to provide him hydration would have bad results. However, she maintained that Williams' awareness was only partial and that she did not process it fully. Compton also acknowledged that she first learned that Williams herself had been previously hospitalized for dehydration at trial and that this fact did not enter into her evaluation. She also agreed that this life experience with dehydration would be important and that an individual's life experiences determine what they know; however, Compton stated that she did not know if this fact would affect her conclusion regarding whether Williams' conduct was knowing. Finally, Compton testified that an individual's behavior around the time and after an incident is indicative of that individual's intent.

## II. The Trial Court Had Jurisdiction

In her third point of error, Williams contends that the 282nd Judicial District Court of Dallas County (the 282nd) did not have jurisdiction over her case because it was not properly transferred to that court's docket. She complains that her case was presented in the 291st Judicial District Court (the 291st) and that it later appeared on the docket of the 282nd, where it remained through entry of judgment, even though no order transferring the case to that court appears in the record. Thus, she argues, the trial court never acquired jurisdiction over the case. The State responds that even though the grand jury was impaneled in the 291st, the indictment was filed and

8

adjudicated in the 282nd. Therefore, the State argues, the 282nd always had jurisdiction over the case, and no order transferring the case was necessary. We agree with the State.

The organization and duties of a grand jury are set forth in Chapters 19 and 20 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN arts. 19.01–.42, 20.01–.22 (West 2015). After a grand jury is formed and impaneled by a district court, it inquires "into all offenses liable to indictment" and hears all accessible testimony prior to voting on whether to indict the accused. TEX. CODE CRIM. PROC. ANN arts. 20.09, 20.19 (West 2015); *Bourque v. State*, 156 S.W.3d 675, 678 (Tex. App.—Dallas 2005, pet. ref'd). Because of the district court's supervisory power over the grand jury, it has sometimes been "'characterized as an arm of the court by which it is appointed rather than an autonomous entity.'" *Bourque*, 156 S.W.3d at 678 (quoting *Dallas County Dist. Attorney v. Doe*, 969 S.W.2d 537, 542 (Tex. App.—Dallas 1998, no pet.)). Nevertheless, since its deliberations are secret, a grand jury retains a "separate and independent nature from the court." *Ex parte Edone*, 740 S.W.2d 446, 448 (Tex. Crim. App. 1987). Once all the testimony is heard, the grand jury votes "as to the presentment of an indictment." TEX. CODE CRIM. PROC. ANN art. 20.19. After presentment, the indictment is filed in a court of competent jurisdiction. *Bourque*, 156 S.W.3d at 678. In counties having two or more district courts or at least one district court and one statutory county court, the judges of the courts may adopt rules governing the "assignment, docketing, transfer, and hearing of all cases" and the distribution of the courts' work considered necessary or desirable to conduct the business of the courts. TEX. GOV'T CODE ANN. § 74.093(a), (b) (West 2013); *see also Murray v. State*, No. 05-13-00954-CR, 2014 WL 1759126, at *1 (Tex. App.—Dallas Apr. 30, 2014, no pet.) (mem. op., not designated

for publication);[6] *Chappel v. State*, 05-10-00629-CR, 2011 WL 2438520, at *1 (Tex. App.—Dallas June 20, 2011, no pet.) (not designated for publication). "Thus, although a specific district court may impanel a grand jury, it does not necessarily follow that all cases returned by that grand jury are assigned to that court." *Bourque*, 156 S.W.3d at 678; *Murray*, 2014 WL 1759126, at *1; *Chappel*, 2011 WL 2438520, at *1.

The record in this case shows that the indictment was presented by a grand jury impaneled by the 291st. It further shows that the case was filed in the 282nd. There is no indication in the record that the case was originally filed on the docket of the 291st. Therefore, no transfer order from the 291st to the 282nd was required. *See Bourque*, 156 S.W.3d at 678; *Murray*, 2014 WL 1759126, at *1; *Chappel*, 2011 WL 2438520, at *1. We find that the trial court had jurisdiction over this case and overrule this point of error.

## III. There Was Sufficient Evidence to Convict Williams

In her first point of error, Williams asserts that there is insufficient evidence to support her conviction for knowingly causing serious bodily injury by omission to J.L. Williams does not dispute that she failed to provide adequate hydration to J.L. or that she failed to seek medical attention for him as alleged by the State; rather, she only challenges the legal sufficiency of the evidence offered to prove that she had the requisite mens rea, specifically that she committed the charged conduct knowing it was reasonably certain to cause the result. She argues that her low IQ

---

[6]Although unpublished cases have no precedential value, we may take guidance from them "as an aid in developing reasoning that may be employed." *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).

and her past history as a child abuse victim prevented her from understanding that her acts and omissions would cause serious bodily injury to J.L. We disagree.

## A. Standard of Review

In assessing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the trier of fact's verdict to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Bell v. State*, 326 S.W.3d 716, 720 (Tex. App.—Dallas 2010, pet. dism'd, untimely filed) (citing *Brooks*, 323 S.W.3d at 898). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the trier of fact "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *see Bell v. State*, 326 S.W.3d at 720.

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*. Williams was charged under Section 22.04(a) of the Texas Penal Code with

> knowingly by omission caus[ing] serious bodily injury to [J.L.], a child 14 years of age or younger, . . . by FAILING TO PROVIDE ADEQUATE HYDRATION TO COMPLAINANT AND BY FAILING TO SEEK ADEQUATE MEDICAL CARE FOR [J.L.], and at the time of the said omission the defendant had a legal and

> statutory duty to act in behalf of [J.L.] in that [Williams] was the mother of [J.L.], and [Williams] had assumed care, custody, and control of [J.L.].[7]

*See* TEX. PENAL CODE ANN. § 22.04(a)(1), (b) (West Supp. 2014).

In this appeal, Williams only challenges the sufficiency of the evidence offered to prove that she failed to act knowing that it would result in serious bodily harm to J.L. Knowingly causing serious injury to a child by omission is a result-oriented crime. *Steele v. State*, No. 05-09-00177-CR, 2010 WL 1965888, at *2 (Tex. App.—Dallas May 18, 2010, pet. ref'd) (not designated for publication); *Lee v. State*, 21 S.W.3d 532, 540 (Tex. App.—Tyler 2000, pet. ref'd); *see also Stuhler v. State*, 218 S.W.3d 706, 718 (Tex. Crim. App. 2007). As such, the State was required to prove that Williams not only engaged in the alleged conduct knowingly, but also that she knowingly caused the result. *See Lee*, 21 S.W.3d at 540 (citing *Cook v. State*, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994)). "Serious bodily injury" is defined as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." TEX. PENAL CODE ANN. § 1.07(46) (West Supp. 2014). With the respect to the result of her conduct, a person acts knowingly "when [s]he is aware that [her] conduct is reasonably certain to cause the result." TEX. PENAL CODE ANN. § 6.03(b) (West 2011). Therefore, the State had to show that when Williams either (1) failed to provide adequate hydration or (2) failed to seek adequate medical care, she was aware that her failure was reasonably certain to (a) create a substantial risk of death, or (b) cause (i) death, (ii)

---

[7]Although the indictment charged both intentional and knowing omissions, the trial court charged the jury only on knowing omissions.

serious permanent disfigurement, or (iii) permanent loss or impairment of the function of any bodily member or organ.

## B.     Analysis

"Proof of a culpable mental state almost invariably depends upon circumstantial evidence." *Lee*, 21 S.W.3d at 539; *see Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (Meyers, J., concurring).  A culpable mental state may be inferred from any facts that tend to prove its existence, including the surrounding circumstances and the acts, words, and conduct of the accused.  *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002); *Lee*, 21 S.W.3d at 539–40 (citing *Ledesma v. State*, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984)).  The trier of fact may consider "events before, during, and after the commission of the offense." *Romero v. State*, No. 05-13-01586-CR, 2015 WL 1788803, at *4 (Tex. App.—Dallas Apr. 17, 2015, no pet. h.) (not designated for publication) (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)).  Also, when the accused attempts to conceal circumstances of the child's injuries, the trier of fact may reasonably infer a culpable mental state.  *See Baldwin v. State*, 264 S.W.3d 237, 243 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd).

In this case, the evidence shows that Williams initially sought to conceal the circumstances of J.L.'s substantial bruising and ligature marks.  At first, she claimed that she had last seen J.L. the night before in his playpen, which was in the upstairs bedroom, and had discovered him that morning at the bottom of the stairs with his hands and feet tangled in ribbons.  However, a search of her apartment showed an extremely hot atmosphere, a playpen full of other items, no ribbons at the bottom of the stairs, and evidence from which the jury could reasonably infer J.L. had been

13

bound in the closet. Eventually, Williams admitted to police that prior to J.L.'s death, she spanked him numerous times and eventually tied him up and barricaded him in an upstairs closet. She also admitted to her mother that even though the air conditioning in the car was working, she kept J.L. in a hot car for about an hour that day in order to punish him. She also told her mother that after returning to the apartment, she put J.L. in the closet.

Through a recorded telephone conversation with her grandmother, the jury heard that Williams herself had twice been hospitalized for dehydration. The jury heard Williams acknowledge that dehydration is a very serious condition. Williams also told her mother that she believed both she and J.L. were dehydrated. Williams told the police that the evening before his death, J.L. had collapsed several times and that his eyes rolled back in his head on several occasions. Also, Williams' psychologist testified that there was some awareness on Williams' part that failing to seek medical attention for J.L. and to give him hydration would produce bad results. She also testified that Williams' prior experience with being hospitalized for dehydration would be important in evaluating Williams' mental state. Further, Williams admitted that she knew that something was wrong with J.L., but claimed that she did not seek medical care for him out of fear that he would be taken from her.

Although there was some evidence that Williams had difficulty processing information, the jury could have reasonably believed that her past experiences with dehydration provided her with sufficient awareness of the consequences of failing to provide J.L. with adequate hydration and failing to seek medical care. From this evidence, a reasonable jury could infer that Williams was aware that her failure to provide adequate hydration and her failure to seek medical care for

14

J.L. would be reasonably certain to cause him serious bodily injury. We overrule this point of error.

## IV. No Reviewable Charge Error Was Presented

In her second point of error, Williams asserts that the trial court erred in submitting a jury instruction regarding good conduct time as required by Article 37.07, Section 4(a) of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(a) (West Supp. 2014). Specifically, she complains that the trial court's charge at the punishment stage told the jury that "[u]nder the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through award of good conduct time." She argues that since she is not eligible for such a reduction, this language erroneously led the jury to believe it was possible for her to receive a reduction in her sentence through good conduct.

Although Williams admits that in an appropriate case, Article 37.07 requires the trial court to submit an instruction on the possibility of good conduct time,[8] she argues that Article 37.07 does not apply to her case because the charge against her is classified as "an offense listed in

---

[8] Article 37.07, Section 4(a) requires the trial court in felony cases to give a five paragraph instruction on good conduct time and parole, including the following:

> "Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner."

TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(a). While the trial court omitted this paragraph from its charge. Williams does not complain of that omission on appeal.

15

Section 3g(a)(1), Article 42.12" of the Code of Criminal Procedure.  *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(a); *see also* TEX. CODE CRIM. PROC. ANN. art. 42.12, § 3g(a)(1)(H) (West Supp. 2014).  Thus, Williams argues that the trial court erred in giving that instruction. Nevertheless, we have reviewed the trial court's charge given at the punishment stage and note that the complained-of language does not appear in the charge.  Therefore, Williams has failed to present us with a reviewable point of error.  We overrule her second point of error.

We affirm the judgment of the trial court.


Ralph K. Burgess
Justice


Date Submitted:     May 29, 2015
Date Decided:       July 6, 2015

Do Not Publish

16