**Affirmed and Memorandum Opinion filed February 28, 2023.**



In The

# Fourteenth Court of Appeals

### NO. 14-21-00097-CR

**REBECCA SUZANNE RIVERA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 10th District Court**
**Galveston County, Texas**
**Trial Court Cause No. 18CR2442**

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Rebecca Suzanne Rivera of causing serious bodily injury to a child, her four-year-old son, known as Jacob, by omission and sentenced her to life imprisonment. Appellant challenges her conviction in two issues. She first contends the evidence is legally insufficient to support the jury's verdict. Second, she argues that the trial court erroneously denied her motion to

suppress two statements to police that violated her *Miranda* rights.[1] After careful review of the record, we overrule appellant's two issues and affirm the trial court's judgment.

## Background

On October 20, 2017, a woman called 911 to report seeing a dead body in the shallow water of Galveston Bay. Emergency responders arrived at the scene, found a four-year-old boy's nude body in the water, and pronounced the child dead.

Law enforcement presumed the child drowned, but there were no reports of missing children or missing swimmers. The Federal Bureau of Investigation released a sketch of the child and created a hotline seeking information. An FBI agent nicknamed the child "Jacob," which is how we refer to him. The FBI received information potentially connecting appellant to Jacob. Eventually, DNA analysis confirmed that appellant was Jacob's mother.

Appellant was indicted on a charge of causing serious bodily injury to a child by omission, specifically by failing to seek timely and adequate medical care when, as Jacob's mother, she had a legal duty to act. Appellant pleaded not guilty. A jury heard the following evidence at trial.

Appellant and her girlfriend, Dania Amezquita Gomez, lived in an apartment with appellant's two children, Jacob and his younger brother, Aaron. According to Gomez, appellant was in charge of disciplining the children. Appellant would scold Jacob, scream at Jacob, put Jacob in a time-out, and hit Jacob with her hand and with a plastic clothes hanger. Jacob had marks on his back, his legs, and hands after being hit, and he would cry. Appellant "tied [Jacob] down once" by tying his

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

hands to a table. When Gomez asked why appellant had done that, appellant said "[b]ecause he doesn't listen, because he misbehaves." Gomez told appellant to never do that again in Gomez's presence because it would "leave [Gomez] traumatized." Gomez threatened to leave if appellant kept disciplining Jacob. Gomez was "tired of the way she treats her child." Gomez denied ever hitting Jacob.

Gomez testified about events that occurred a few days before Jacob's death. Gomez heard a loud noise from the bedroom, where appellant was with Jacob. Gomez went to see what happened. Jacob was laying on the floor "with lots of blood" from his forehead. Gomez did not ask what happened but suspected that appellant hit Jacob because "he didn't listen." Gomez believed that "[appellant] hit [Jacob]. . . . She either threw him or she hit him."

Appellant did not take Jacob to a hospital or clinic, nor did she call 911. Appellant put a bandage on his head and gave him pain medication for the headache. Gomez did not call a doctor because she was in the country illegally and because she was afraid that authorities would take Aaron.

The first and second day after the injury, Jacob looked okay and continued to eat. But on the third day, "he looked weak . . . [and] sick." He could not walk and was swollen. Gomez told appellant to take Jacob to the hospital because it was not normal for him to have bled so much. Appellant said she could not take him to the hospital because Jacob had bruises on his body and she was scared to get in trouble.

On the last day Gomez saw Jacob alive, he was "more deteriorated and sick." He was not moving a lot and looked very sad. Gomez did not know when

3

Jacob passed away because she was very drunk. But she went with appellant to Galveston, where appellant "threw him on the beach."[2]

The day after Jacob died, appellant and Gomez left Texas and drove to Illinois, where they stayed for several months. During that time, appellant changed the license plates on her car and painted the hood of the car a different color.

Gomez admitted that, despite being interviewed four times during the investigation, she never told police that appellant abused Jacob and she consistently said that appellant was a good mom. Gomez said she never told law enforcement that appellant abused Jacob because she "didn't want to lose [Aaron]."

Dr. Erin Barnhart, chief medical examiner for Galveston County, testified about the autopsy performed on Jacob's body.[3] There was no evidence of animal predation to Jacob's body, which led Dr. Barnhart to estimate that Jacob was in the water for less than a day. Jacob's body showed multiple injuries, all sustained pre-mortem, such as lacerations, ligature marks, and bruises. Jacob was also extremely malnourished and had bronchopneumonia.

In Dr. Barnhart's opinion, none of Jacob's injuries on their own would have caused death. However, his overall health was very poor, based on his nutritional status and the number of injuries. Because of his poor health, his pneumonia could have been "more damaging" than it would have been in a healthy person. Dr. Barnhart considered the external injuries and scars and the malnourishment as

---

[2] Gomez was charged with tampering with evidence and injury to a child by omission for her role in Jacob's death. Gomez testified pursuant to a plea agreement, wherein she agreed to testify truthfully and plead guilty to the charges against her in exchange for the district attorney recommending a two-year sentence.

[3] A different medical examiner, Dr. Mambo, performed the autopsy and wrote the report, but he died before trial.

evidence of serious bodily injury, which "almost certainly contributed" to Jacob's death.

Dr. Mambo found that the cause of Jacob's death was undetermined, but that a "homicidal death by unknown means cannot be excluded."

Dr. Patricia Beach is a pediatrician at the University of Texas Medical Branch in Galveston and director of the ABC Patient Safety and Protection Team, which focuses on evaluation, prevention, and assessment of child abuse. She confirmed that Jacob had a number of "clearly inflicted injuries," such as scars and wounds caused by a cord or implement. In Dr. Beach's view, Jacob was "emaciated" and "terribly malnourished." Based on her review of the autopsy, she would consider Jacob's pneumonia to be "moderate." In her opinion, not seeking medical care for an extremely malnourished child with moderate pneumonia could cause serious bodily injury or death to the child.

Appellant called only one witness, Dr. Paul Radelat. Dr. Radelat confirmed that Jacob was starved and malnourished. However, Dr. Radelat opined that Jacob's death may have been caused by "Refeeding Syndrome." That syndrome describes a metabolic process wherein, if a starving person eats too much food, the person's phosphorus levels can get dangerously low and cause a cardiac arrhythmia or arrest and, in some cases, death. Because the autopsy revealed that Jacob had some food in his stomach, Dr. Radelat believed that the syndrome may have caused Jacob's death, although he could not say with certainty how Jacob died.

The jury found appellant guilty as charged in the indictment and sentenced appellant to confinement for life. The trial court signed a judgment in accordance with the jury's verdict, and appellant timely appealed.

5

**Analysis**

**A.    Legally sufficient evidence supports the jury's verdict.**

In her first issue, appellant argues that the evidence is insufficient to support the jury's verdict.

1.    *Standard of review*

In determining whether the evidence is legally sufficient to support a conviction, "we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)); *see also Braughton v. State*, 569 S.W.3d 592, 607-08 (Tex. Crim. App. 2018).  We presume that the jury resolved conflicting inferences in favor of the verdict, and we defer to its determination of the evidentiary weight and witness credibility.  *See Braughton*, 569 S.W.3d at 608; *Criff v. State*, 438 S.W.3d 134, 136-37 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd).  The scope of our review includes all the evidence admitted at trial, whether it was properly or improperly admitted.  *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).  We consider both direct and circumstantial evidence, as well as any reasonable inferences that may be drawn from the evidence.  *See Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016).  Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.  *See Hooper*, 214 S.W.3d at 13.

The State charged appellant with injury to a child by omission under Texas Penal Code section 22.04.  As relevant here, a person commits an offense under

6

that section if she intentionally, knowingly, or recklessly by omission causes serious bodily injury to a child. *See* Tex. Penal Code § 22.04(a)(1).

In contrast to the majority of crimes, which proscribe a particular action, an omission is punished only when there is "a corresponding duty to act." *Billingslea v. State*, 780 S.W.2d 271, 274 (Tex. Crim. App. 1989); *see also Florio v. State*, 784 S.W.2d 415 (Tex. Crim. App. 1990). Chapter 6 of the Penal Code states that generally a person who omits to perform an act does not commit an offense. Exceptions exist only when "a law . . . provides that the omission is an offense or otherwise provides that [an individual] has a duty to perform the act." Tex. Penal Code § 6.01(c). Penal Code section 22.04 is one of the exceptions. Parents stand in a special relationship to their children and have statutory duties including providing their children with food, shelter, or other necessities including medical care and protection from harm. Tex. Fam. Code § 151.001(a)(2-3).

Injury-to-a-child offenses under section 22.04 are "result-oriented" and "requir[e] a mental state that relates not to the specific conduct but to the result of that conduct." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (citing *Alvarado v. State*, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985)). To prove injury to a child by omission under section 22.04, the State must show a person (1) "intentionally, knowingly, or recklessly," (2) "by omission," (3) "cause[d] to a child," (4) "serious bodily injury; serious mental deficiency, impairment, or injury; or bodily injury." Tex. Penal Code § 22.04(a). The indictment and the jury charge in this case limited the required culpable mental state to intentionally or knowingly and the result to serious bodily injury. The charge defined "serious bodily injury" to mean "a bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."

Appellant argues that the evidence is insufficient to prove (1) that appellant's omission caused Jacob serious bodily injury because the coroner ruled the death as "undetermined" and (2) that appellant acted with the required culpable mental state.

2.    *Causation*

Appellant contends that no evidence linked appellant's failure to seek medical care to any serious bodily injury. We disagree.

Jacob appeared to be severely malnourished. He was "extremely, extremely thin," with very little fat around his abdomen, buttocks, and thighs, and was much smaller physically than Dr. Barnhart would expect of a child his age.[4]

At death, Jacob had bronchopneumonia throughout his lungs. It is normally treatable with medical care. There were chemicals in his blood consistent with cough syrup.[5]

Dr. Barnhart testified that Jacob's body showed evidence of multiple injuries, all sustained pre-mortem. His right eye and cheek and his upper lip were bruised and swollen. He had healing lacerations on the inside of his mouth, mostly likely from blunt force or very hard pressure against his teeth. Dr. Barnhart agreed that the injuries were consistent with a punch to the face. He had a number of abrasions and lacerations on his forehead.

Jacob had several curved lesions on his chest and back, which were consistent with being injured by a hanger and were in various stages of healing,

---

[4] Jacob was twenty-eight pounds at death; according to Dr. Barnhart, a healthy child his age would weigh forty-five pounds.

[5] As discussed below, appellant told law enforcement that, before Jacob died, he accidentally ingested rubbing alcohol, which she believed led to his death. There was no evidence of isopropyl or rubbing alcohol in Jacob's blood.

8

meaning that they were inflicted at different times. He also had contusions or bruises on his chest, abdomen, and legs. Jacob had "a number" of "circular, punched-out lesions" on his back, which were "highly suggestive of cigarette burns." He had a similar burn on his left elbow, which "extend[ed] down to the bone." Jacob had partially or mostly healed wounds on his wrists and ankles, characteristic of being tied up with a thin ligature. Dr. Beach confirmed that Jacob had a number of "clearly inflicted injuries," such as scars and wounds caused by a cord or implement.

Dr. Barnhart considered the external injuries and scars and the malnourishment as evidence of serious bodily injury, which "almost certainly contributed" to Jacob's death. In Dr. Beach's view, Jacob was "emaciated" and "terribly malnourished." Based on her review of the autopsy, she would consider Jacob's pneumonia to be "moderate." In her opinion, not seeking medical care for an extremely malnourished child with moderate pneumonia could cause serious bodily injury or death to the child. Jacob's body showed no indications of medical intervention.

Appellant's expert, Dr. Radelat, agreed that Jacob was starved and malnourished at the time of his death. He also acknowledged that Jacob's pneumonia "contributed or may have been the reason or maybe just a contributing reason" to his death.

Viewing the evidence in the light most favorable to the verdict, we hold that the jury reasonably could have found that appellant put Jacob at a substantial risk of death or caused his death when she failed to provide medical care after he developed pneumonia while being extremely malnourished. *See, e.g.*, *Estrella v. State*, 546 S.W.3d 789, 797-98 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd) (evidence supported guilty verdict of injury to a child by omission when child was

9

chronically malnourished); *Guerrero v. State*, No. 04-15-00762-CR, 2016 WL 4537694, at *7-8 (Tex. App.—San Antonio Aug. 31, 2016, no pet.) (mem. op., not designated for publication) (evidence supported guilty verdict for injury to child by omission when mother did not seek medical treatment for child's malnourished and weakened condition, even though the cause of death was undetermined).

Additionally, the jury could have believed Gomez's version of events and found that appellant put Jacob at a substantial risk of death or caused his death when she failed to provide medical care after he sustained a head injury and his physical condition noticeably declined over three days. *See, e.g.*, *Galloway v. State*, No. 02-18-00132-CR, 2019 WL 2223580, at *6 (Tex. App.—Fort Worth May 23, 2019, pet. ref'd) (mem. op., not designated for publication) (evidence supported guilty verdict for injury to a child by omission when mother did not seek medical attention for newborn, despite seeing child struggling to breathe).

In support of her causation argument, appellant relies heavily on *Dusek v. State*, 978 S.W.2d 129 (Tex. App.—Austin 1998, pet. ref'd). In *Dusek*, the defendant brought her child to the emergency room with a broken leg. The defendant was convicted of intentionally or knowingly causing serious bodily injury to a child by omission by, among other things, failing to provide prompt medical treatment for the child's broken leg. *Id.* at 133. The Austin Court of Appeals reversed, stating that it was not sufficient for the State to prove that the defendant had failed to provide medical care for a serious bodily injury. *Id.* Instead, it was necessary to prove that the child suffered serious bodily injury because the defendant had failed to provide medical care. *Id.*

In *Dusek*, there was no evidence that the mother failed to obtain medical treatment for the broken leg; that any omission on the mother's part aggravated the seriousness of the child's injury; that the child's leg had been broken for an

10

unusual period of time; that treatment had been delayed; or that recovery was in any way hindered by a delay in receiving medical care. *Id.* Therefore, the court reversed the conviction of injury to a child by omission for failure to obtain medical care for the child.

*Dusek* is easily distinguishable. Appellant did not obtain any medical treatment for Jacob's malnutrition or his pneumonia. Further, there is evidence from Dr. Barnhart and Dr. Beach that appellant's failure to seek medical care for an extremely malnourished child with moderate pneumonia posed a substantial risk of causing serious bodily injury or death to the child. *Dusek* does not compel a contrary result.

### 2. *Culpable mental state*

Appellant was charged with "intentionally" or "knowingly" committing the offense of serious bodily injury to a child. A person acts "intentionally" or with intent "with respect to . . . a result of [her] conduct when it is [her] conscious objective or desire to . . . cause the result." Tex. Penal Code § 6.03(a). A person acts "knowingly" or with knowledge "with respect to a result of [her] conduct when [she] is aware that [her] conduct is reasonably certain to cause the result." *Id.* § 6.03(b). The charge instructed the jury on these definitions.

When a defendant is charged with injuring a child "by omission," the evidence is sufficient to support a conviction "if the State proves either that a defendant intended to cause the injury through her omission or that she was aware that her omission was reasonably certain to cause the injury." *Tijerina v. State*, No. 13-11-00430-CR, 2012 WL 3525632, at *5 (Tex. App.—Corpus Christi Aug. 16, 2012, no pet.) (mem. op., not designated for publication). Stated another way, "knowingly" causing the child's injury requires evidence that the defendant was aware with reasonable certainty that the result of serious bodily injury or death

11

would have been prevented had the defendant performed the act that was omitted. *Payton v. State*, 106 S.W.3d 326, 329 (Tex. App.—Fort Worth 2003, pet. ref'd).

Mental state is rarely proved through direct evidence and almost always depends on circumstantial evidence. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002); *Smith v. State*, 56 S.W.3d 739, 745 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). Knowledge and intent may be inferred from any facts which tend to prove their existence, including the acts, words, and conduct of the accused or the method of committing the crime, and from the nature of wounds inflicted on the complainant. *Hart*, 89 S.W.3d at 64. Knowledge that failure to obtain medical care is substantially certain to result in serious bodily injury can be inferred from the circumstances apparent to the defendant, including the child's condition and appearance. *See Proenza v. State*, 471 S.W.3d 35, 46 (Tex. App.—Corpus Christi 2015), *aff'd in part on other grounds*, 541 S.W.3d 768 (Tex. Crim. App. 2017); *Baldwin v. State*, 264 S.W.3d 237, 243 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd).

Here, the jury saw photographs of Jacob's emaciated body and heard testimony from Dr. Barnhart and Dr. Beach that Jacob was malnourished and underweight while suffering from pneumonia. The jury reasonably could have inferred from the autopsy photographs and the doctors' testimony that appellant must have known that Jacob was physically weakened by malnutrition, chose to ignore the problem, and was aware that Jacob would suffer further injury or death as a result. *See Proo v. State*, 587 S.W.3d 789, 812-13 (Tex. App.—San Antonio 2019, pet. ref'd) (photographs and testimony refuted defendant's claim that she did not know anything was wrong with child); *Sifuentes v. State*, No. 04-12-00607-CR, 2013 WL 3422916, at *6 (Tex. App.—San Antonio July 3, 2013, no pet.) (mem. op., not designated for publication) (noting that photographs were "strong evidence

12

that the defendant must have known something was going on with the child and chose to ignore it"); *Baldwin*, 264 S.W.3d at 243 (defendant's failure to obtain medical care or provide adequate food or nourishment in light of child's obviously malnourished condition was sufficient to support reasonable inference that defendant consciously desired or was aware that her conduct was reasonably certain to cause serious bodily injury).

Additionally, if the jurors believed Gomez's version of events, they reasonably could have found that appellant knew that Jacob had sustained a head injury and deteriorated over a number of days. Coupled with Gomez's testimony that she urged appellant to take Jacob to a hospital, along with the reasons why appellant chose not to take him, the jury could have inferred that appellant knew Jacob was in need of medical care, nevertheless refused to seek treatment, and was aware that Jacob would suffer further injury or death as a result. *See Tijerina*, 2012 WL 3525632, at *5; *Payton*, 106 S.W.3d at 328-30.

Appellant points to other evidence, such as the facts that she tried to sterilize and bandage his head and that Jacob had cough syrup in his system and had eaten prior to death, to show that she did not intend to harm her child by her omission. In *Tijerina*, the defendant grandmother made a similar argument, claiming she thought the child only had the stomach flu and thus she did not knowingly or intentionally cause his death by failing to provide timely medical care. *Tijerina*, 2012 WL 3525632, at *5-6. The court disagreed and held that eyewitness testimony that the child had bruises all over his face and body and large abrasions on his head and scalp provided evidence of the extent of the grandmother's awareness of the child's condition. *Id.* at *2-3, 5-6 (describing how "death by internal bleeding" is a prolonged process with obvious changes to a child's behavior and demeanor, and stating that "anyone would have known something

13

was wrong, regardless of medical training" and would have known the child needed to get to a hospital immediately). We likewise reject appellant's argument here. We review the evidence in the light most favorable to the verdict, and the facts on which appellant relies do not refute the reasonable inference from other facts the jury could have believed that appellant must have known that Jacob badly needed medical treatment. To the contrary, besides Jacob's obvious malnourished condition, the cough syrup and the use of rubbing alcohol establish that Jacob suffered a head injury and/or had a respiratory illness, both of which worsened over time, and that appellant was aware of the need for medical attention.

We also note that appellant fled Texas the day of Jacob's death after dropping Jacob's body on a Galveston beach, attempted to conceal her whereabouts by changing her vehicle's license plates and changing the car's color, and initially tried to mislead law enforcement into believing that Jacob had been kidnapped. Jurors reasonably could infer guilt from this circumstantial evidence. *See Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) ("Evidence of flight evinces a consciousness of guilt."); *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt.").

We hold that legally sufficient evidence supports the jury's verdict, and we overrule appellant's first issue.

## B. The trial court did not abuse its discretion in admitting appellant's statements to police.

Appellant filed a motion to suppress and an amended motion to suppress her April 2018 and June 2018 statements to police, which the trial court denied. In the

14

motions, appellant argued that in taking the statements, police did not comply with *Miranda* and Code of Criminal Procedure article 38.22(a).

1.    *Custodial interrogations*

Statements produced by custodial interrogation are inadmissible unless the accused is first warned that she has the right to remain silent, her statement may be used against her, and she has the right to hire a lawyer or have a lawyer appointed. *Miranda*, 384 U.S. at 479.

Whether the interrogation is custodial—that is, whether a person is in custody—requires two inquiries:  the circumstances surrounding the interrogation and whether a reasonable person in those circumstances would have felt that she was not free to leave.  *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).  "Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test" to determine whether there was restraint on freedom of movement of a degree associated with arrest.  *Id.*  The ultimate inquiry is whether, under all of the circumstances, there was a formal arrest or a reasonable person would have believed that her freedom of movement was restricted to the degree associated with a formal arrest.  *Stansbury v. California*, 511 U.S. 318, 322 (1994); *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996).  The "reasonable person" standard presupposes an innocent person.  *Dowthitt*, 931 S.W.2d at 254.

The Court of Criminal Appeals has outlined at least four general situations that may constitute custody:  (1) when the suspect is physically deprived of her freedom of action in any significant way; (2) when a law enforcement officer tells the suspect that she cannot leave; (3) when law enforcement officers create a situation that would lead a reasonable person to believe that her freedom of movement has been significantly restricted; and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that she is free to leave.

15

*Id.* at 255.  For the first three situations, the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention.  *Id.*  Concerning the fourth situation, the officers' knowledge of probable cause must be manifested to the suspect, and custody is established only if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe she is under restraint to a degree associated with an arrest.  *Id.*; *Wexler v. State*, 625 S.W.3d 162, 168 (Tex. Crim. App. 2021).

To evaluate whether a reasonable person in the suspect's situation would have felt that there was a restraint on her freedom to a degree associated with arrest, the record must establish the circumstances manifested to and experienced by her.  *State v. Ortiz*, 382 S.W.3d 367 (Tex. Crim. App. 2012) ("[O]nly the objective circumstances known to the detainee should be considered in deciding what a reasonable person in his position would believe.").  It is the defendant's initial burden to establish that her statement was the product of custodial interrogation.  *Wexler*, 625 S.W.3d at 168.

2.     *Standard of review*

A trial court's ruling on a motion to suppress is reviewed for abuse of discretion and should be reversed only if it is outside the zone of reasonable disagreement.  *State v. Cortez*, 543 S.W.3d 198, 203 (Tex. Crim. App. 2018); *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014).  We apply a bifurcated standard of review, giving almost total deference to the trial court's determination of historical facts and credibility when supported by the record.  *State v. Hardin*, ---S.W.3d---, 2022 WL 16635303, at *2 (Tex. Crim. App. 2022).  An appellate court must afford almost total deference to the trial court's assessments of historical fact and conclusions with respect to mixed questions of law and fact that turn on credibility and demeanor.  *State v. Saenz*, 411 S.W.3d 488, 494 (Tex. Crim.

16

App. 2013).  In contrast, we must review de novo mixed questions of law and fact that do not turn on credibility and demeanor.  *Id.*

When the trial court signs fact findings, as the trial court did in this case, we determine whether the evidence (viewed in the light most favorable to the trial court's ruling) supports them.  *Hardin*, 2022 WL 16635303, at \*2.  We review legal conclusions de novo.  *Saenz*, 411 S.W.3d at 494.

In reviewing a trial court's ruling, we generally consider only evidence adduced at the suppression hearing because the ruling could not have been based on evidence introduced later.  *See Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996).  This general rule, however, is inapplicable when the parties consensually relitigate the suppression issue during the trial on the merits.  *Id.* When the State raises the issue at trial either without objection or with subsequent participation in the inquiry by the defense, the defendant has made an election to reopen the evidence, and consideration of the relevant trial testimony is appropriate in our review.  *Id.*  Here, because both the prosecutor and appellant's attorney asked questions during the State's case-in-chief regarding the circumstances surrounding the day appellant made her statements, we will consider the evidence adduced at both the suppression hearing and the trial on the merits.  *See id.*

3.    *April statement*

After the FBI received information potentially linking Jacob to appellant, Special Agent Mary Beth Wright and Lieutenant Tommy Hansen went to an apartment where they believed appellant could be located, on April 5, 2018.  But appellant was not there, and the officers later learned that appellant and Gomez fled by jumping off the apartment's second-floor balcony.

17

On April 10, Special Agent Ricardo Martinez and Lieutenant Hansen returned to the apartment. Lieutenant Hansen spoke to appellant inside the apartment while Agent Martinez spoke to Gomez outside. When asked where her son was, appellant told Lieutenant Hansen that Jacob had been kidnapped. Appellant argues that her statement to Lieutenant Hansen—that Jacob had been kidnapped—was the product of a custodial interrogation and should have been suppressed. The procedural posture of appellant's attempts to suppress the April statement is somewhat muddled, as is the timeline of underlying events.

Prior to trial, appellant moved to suppress the statement because she was not given the required warnings under *Miranda*. The trial court conducted a hearing, at which Sergeant Banks and Agent Martinez testified, and the court denied the motion. In an amended motion to suppress, appellant asserted that she did, in fact, receive a *Miranda* warning. At the hearing on the amended motion, the State stipulated that appellant "was Mirandized on April 10, 2018" and that appellant "did, in fact, request an attorney." The trial court found that the amended motion was "substantially the same" as the initial motion, with the addition of the State's stipulation. Without hearing additional evidence, the trial court denied the amended motion to suppress the April statement.

Although it is undisputed that Lieutenant Hansen warned appellant under *Miranda*, it is unclear exactly when during the encounter the admonishment occurred. The trial court found that "Sergeant Banks and Special Agent Martinez believed Lieutenant Hansen *Mirandized* [appellant] and that [appellant] requested an attorney at some point during her encounter with Lieutenant Hansen. The timing of any statements [appellant] made, when the admonishments were given, [appellant's] invocation, and continued questioning by law enforcement was not developed in the record."

18

It was appellant's initial burden do demonstrate she was in "custody" when she made the April statement at issue. The trial court did not find, and appellant does not contend, that Lieutenant Hansen admonished her immediately when he entered the apartment. In her brief, appellant frames her argument based on a scenario that appellant spoke to Lieutenant Hansen *before* he, at some point, warned her under *Miranda*. This is also how the trial court framed its findings of facts and conclusions of law.

Appellant told Lieutenant Hansen that her son had been kidnapped. After telling Lieutenant Hansen that information, appellant reportedly stopped answering the officer's questions and asked for a lawyer. Lieutenant Hansen then called the detective in charge of Jacob's case, Sergeant Jeff Banks with the Galveston Police Department ("GPD"), relayed the information from appellant, and requested Sergeant Banks's presence at the apartment. It is undisputed that at some point in the encounter before Sergeant Banks arrived, Lieutenant Hansen read appellant her *Miranda* rights.[6]

Sergeant Banks went to the apartment and spoke to appellant. He asked her "a few very limited questions, not -- not trying to build a case or anything like that" but seeking "identifying information." Sergeant Banks showed appellant a photo of the deceased child, and appellant agreed that the child resembled her son. Appellant also told Detective Banks other identifying characteristics about Jacob that were consistent with the child found in Galveston. Sergeant Banks checked to see if there were any missing person reports for appellant's child, and there were none. Sergeant Banks did not believe anyone questioned appellant after he did. Sergeant Banks also spoke to Gomez and learned that, the night before Jacob's body was discovered in Galveston, appellant and Gomez left Texas. At that point,

---

[6] Lieutenant Hansen did not testify in this case.

19

Sergeant Banks "determined [he] wanted to get a search warrant" for appellant's DNA. At that point, appellant was detained.

For at least some amount of time, only two officers were present—Lieutenant Hansen and Agent Martinez. At some point, GPD Detective Ernesto Garcia arrived at the apartment. Later, Sergeant Banks arrived, along with another GPD detective. None of the officers were in uniform. Sergeant Banks kept his department firearm holstered at all times.

A CPS investigator also arrived at the apartment. According to Sergeant Banks and Agent Martinez, they later learned from appellant that the CPS investigator was "reasonably confrontational," "hostile," and "aggressive" with appellant. Appellant tried to stand up while being questioned, and the CPS investigator told her to sit down.

The encounter between law enforcement and appellant lasted approximately three hours. Sergeant Banks was there "maybe an hour or two," but he believed the FBI was there at least an hour longer.

Sergeant Banks agreed that appellant "was detained" while he obtained the search warrant for her DNA. At the end of the encounter, Sergeant Banks took a sample of appellant's DNA by buccal swab. He told appellant that "if the DNA came back [as a match], [he would] come back and talk again." Law enforcement took Gomez into custody. At some point, officers seized appellant's and Gomez's cell phones. At the end of the interview, officials took Gomez into custody for an immigration violation.

The trial court found that Sergeant Banks and Agent Martinez were credible witnesses. The court also found that: appellant was not transported by the police from the apartment; appellant was not handcuffed; officers did not point their

firearms at appellant; there were no acts of intimidation, threats, or coercion by the police; and appellant was not arrested. Based on these facts, the court concluded that appellant was not in custody when she gave her April 10 statement that Jacob had been kidnapped.

Appellant argues that a reasonable person would have believed she was in custody when she told officers that her child had been kidnapped because: multiple agencies of the government, namely the FBI, GPD, and CPS, were present at the apartment; officers took Gomez into custody; appellant's child had died; the investigation was criminal and concerned the death, dumping, and identity of a child; appellant was more comfortable speaking Spanish than English; the CPS investigator was harsh with appellant and would not allow her to stand up; appellant and Gomez were separated; appellant's cell phone was confiscated; appellant was read her statutory warnings; appellant invoked her right to counsel; appellant was not free to leave while officers secured a search warrant for appellant's DNA; more officers were posted outside appellant's apartment while the warrant was secured; the warrant was executed and DNA collected from appellant; and officers told appellant they would return when they got the DNA results.

Some of appellant's assertions are not supported by the record or do not support the conclusion that she was in custody when she spoke to Lieutenant Hansen. For instance, although appellant says her "child had died," no one in law enforcement knew that because they did not know the dead child's identity at that point or how he died. Further, Gomez was not taken into custody until the end of the encounter, and the officers' actions in obtaining and executing the DNA search warrant occurred after appellant told Lieutenant Hansen that her child had been kidnapped. Appellant contends that she was more comfortable speaking Spanish,

21

but the record is clear that she spoke both English and Spanish, and there is no indication that she told any law enforcement officer on April 10 that she preferred communicating in Spanish. Although at one point the CPS investigator told appellant to sit down when she tried to stand up, there is no indication or allegation that the CPS investigator was working "in tandem with police." *Wilkerson v. State*, 173 S.W.3d 521, 523, 529 (Tex. Crim. App. 2005).

Thus, we are left with the facts that several officers arrived at different times to the apartment, as did a CPS investigator; that appellant and Gomez were separated; that, at some unknown point, officers took appellant's cell phone; that, at some unknown point, appellant was given a *Miranda* warning;[7] and that, at some unknown point, she requested an attorney. Further, the record supports the court's findings that appellant was questioned in her private residence and was not transported to a police station. Appellant's physical freedom was not restrained by handcuffs or by threats and at no point was appellant placed under arrest. She was not removed from the apartment, nor was she told that she could not leave, at least until Sergeant Banks decided to obtain a search warrant, which occurred after appellant spoke to Lieutenant Hansen.

Viewing all the circumstances in the light most favorable to the trial court's findings, we conclude that the trial court did not abuse its discretion in denying the motion to suppress the April statement. The trial court reasonably could have found that appellant failed to meet her burden to show that she was in custody or that her freedom of movement was restrained to the degree associated with a

---

[7] Although it is undisputed that, at some point, Lieutenant Hansen gave appellant a *Miranda* warning and she requested an attorney, law enforcement officials had no obligation to "scrupulously honor" that request in a noncustodial interrogation setting. *See Estrada v. State*, 313 S.W.3d 274, 296 (Tex. Crim. App. 2010) (explaining that police are not required to honor request for counsel or invocation of right to silence during noncustodial interrogation setting); *State v. Howard*, 378 S.W.3d 353, 540-41 (Tex. App.—Fort Worth 2012, pet. ref'd).

formal arrest when she told Lieutenant Hansen that her child had been kidnapped. *See Estrada*, 313 S.W.3d at 296; *see also Mora-Hernandez v. State*, No. 03-13-00548-CR, 2016 WL 6677929, at *5 (Tex. App.—Austin Nov. 9, 2016, no pet.) (mem. op., not designated for publication) (trial court did not abuse its discretion in denying motion to suppress because appellant failed to establish that he was in custody so as to trigger the *Miranda* requirements, including right to counsel).

### 4. *June statement*

After Gomez was arrested in April, Sergeant Banks interviewed her and she gave him "some information, but not very much." Gomez essentially told Sergeant Banks to question appellant if he wanted to know what happened to Jacob. Sergeant Banks had "exhausted pretty much every investigative means," but he "still didn't know how the child died . . . [or] how exactly the body ended up in Galveston." The DNA sample proved that appellant was Jacob's mother, but Sergeant Banks did not have enough specifics to "move forward with anything." Prior to the June interview, Sergeant Banks spoke with the Galveston County District Attorney's Office about "not having probable cause to arrest [appellant] on any charge." Sergeant Banks decided to re-approach appellant.

On June 19, Sergeant Banks and Agent Martinez returned to question appellant in her apartment, and they audio-recorded the interview. Appellant was in the bedroom, on the bed but under a blanket, wearing a T-shirt and underwear, and the television was on. She had been asleep when Sergeant Banks entered the room or she had recently awoken. Sergeant Banks asked appellant if he could sit down and talk with her, and she agreed. Sergeant Banks sat in the only chair in the room, while Agent Martinez sat on the end of the bed. Although Agent Martinez admitted that it was slightly "uncomfortable" for him to sit on the bed, "because

23

there's a female laying in bed," he explained that he did not want to stand over appellant with an "overbearing presence."

Neither officer made physical contact with appellant or asked her to show her hands. Neither officer warned appellant under *Miranda*. The door to the bedroom was open or partially open the entire time. Sergeant Banks's gun was holstered on his hip, Agent Martinez's at his ankle. At no point did the officers unholster their weapons. Both officers were in plain clothes.

Sergeant Banks told appellant that the DNA results matched her as the dead child's mother. Agent Martinez told appellant that Gomez was "under arrest for her role in the death of [Jacob]."

One of the first things Sergeant Banks said was, "I'm not here to arrest you okay?" He continued, "I don't have a warrant for your arrest. It's not a trick or anything like that." The officers told appellant that they wanted to hear her side of the story. At the suppression hearing, Banks testified that he told appellant that "it looked bad" but he "wanted to get her side of it, because it could be either an accident, all the way up to a capital murder."

Appellant was "hesitant" and "upset." She cried and "said stuff to [the] effect" that she did not want to talk about what happened with Jacob. Sergeant Banks agreed at trial that, for long periods of time, appellant would not answer questions about Jacob's death. She did not begin answering questions until the last thirty minutes of the approximately four-hour interview. Sergeant Banks testified that appellant was "extremely reluctant" to provide information. But she never asked the officers to leave.

During the interview, appellant asked to use the bathroom, and Sergeant Banks immediately said, "Okay." Both officers testified that they gave appellant

privacy in the bathroom, though Agent Martinez first checked the room to ensure that appellant could not escape or access anything dangerous. He and Sergeant Banks remained outside the bathroom until appellant returned to the bedroom and laid on the bed.

Sergeant Banks and Agent Martinez were the only officers in the apartment. Near the end of the interview, "other plain clothes detectives showed up" across the street to surveil the apartment because Sergeant Banks hoped to get an arrest warrant if he "had enough probable cause." There is no indication that appellant was aware of the additional officers' presence.

The interview lasted approximately four hours. Agent Martinez asked appellant if she killed Jacob, and she denied it. Eventually, appellant gave an explanation for Jacob's death. She said that Jacob ran into a wall in the apartment. Appellant tried nursing the cuts on his face with isopropyl alcohol but dropped the bottle because she was fighting with Gomez. The bottle hit Jacob's head, and appellant feared he swallowed some of the liquid. Her uncle had died after ingesting rubbing alcohol, and she saw the same thing happening with Jacob. Over the next few days, Jacob's face and eyes became swollen, and his stomach ached. He could not sit, stand, or walk; he just lay on the floor. Appellant said that about a week elapsed between Jacob's ingestion of alcohol and his death. Jacob died in the night, and appellant and Gomez took his body to Galveston. When asked where she left Jacob in Galveston, appellant named the part of the beach where he was found.

At the very end of the interview, appellant "confess[ed] to a few things that would constitute a crime," which in Sergeant Banks's opinion gave rise to probable cause, such as admitting that she took Jacob to Galveston, that she failed to provide medical care to the child, and that she beat him with various objects. Similarly,

25

Agent Martinez testified that they developed probable cause "[t]owards the conclusion of the interview when she was becoming a little more open and explained the circumstances around [Jacob's] death." Appellant then told Agent Martinez that she had answered too many questions. Agent Martinez asked if she wanted the officers to give her a few days and come back to talk some more. Appellant said that was fine "but not right now." After leaving their contact information and warning appellant not to flee after they left, the officers terminated the interview.

After the interview, Sergeant Banks conferred with the Galveston County District Attorney's Office, and the district attorney determined that there was probable cause for "a tampering charge." Several hours after Sergeant Banks and Agent Martinez left the apartment, GPD arrested appellant pursuant to a warrant.

The trial court found that Sergeant Banks and Agent Martinez were credible witnesses. The court also found that: appellant agreed to speak with Sergeant Banks; appellant was not transported by the police from the apartment; appellant was not handcuffed; appellant voluntarily remained in her bed; the officers did not point their firearms at appellant; there were no acts of intimidation, threats, or coercion by the police; appellant never asked the officers to leave; and appellant was not arrested. Based on these facts, the court concluded that appellant was not in custody when she gave her June 19 statement.

Appellant argues that the evidence establishes that she was in custody when she gave her June 19 statement. She contends that a reasonable person would believe her freedom of movement had been restricted because she was "trapped in her underwear by a police officer and an FBI agent and interrogated for four

26

hours."[8] The record does not support appellant's contention. As the trial court found, and consistent with evidence the court reasonably could have believed, appellant agreed to speak to Sergeant Banks, voluntarily stayed in her bed, and was immediately allowed to go to the bathroom when she asked. Also, Sergeant Banks almost immediately told appellant that he was not there to arrest her, which he and Agent Martinez repeatedly reiterated during the interview. A reasonable person would not believe, based on these circumstances, that her freedom of movement was restricted to the degree associated with a formal arrest. *See, e.g.*, *Miles v. State*, No. 06-18-00147-CR, 2019 WL 2195255, at \*4-5 (Tex. App.—Texarkana May 22, 2019, no pet.) (mem. op., not designated for publication) (record supported trial court's conclusion that defendant was not in custody when he agreed to speak with detectives, he was questioned "in the living room of his own home with a view of windows and doors leading to the outside," the detectives never restricted his movement or told him he was under arrest, and detectives left after defendant asked to end the interview); *Gray v. State*, No. 08-14-00103-CR, 2015 WL 7766300, at \*4 (Tex. App.—El Paso Dec. 2, 2015, no pet.) (mem. op., not designated for publication) (defendant was not in custody when he was not physically restrained, sat at the kitchen table in his home when questioned by law enforcement, and remained there after providing his statement); *see also Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (holding that person was not in custody when he came voluntarily to police station, was immediately informed that he was not under arrest, participated in interview, and left police station without hindrance).

Additionally, appellant argues that the circumstances indicated she was in custody because there was probable cause to arrest appellant and the officers did not tell her she was free to leave.

---

[8] Appellant also argues that she was physically deprived of her freedom, but it is undisputed that appellant was never handcuffed or otherwise physically restrained.

During the interview, Agent Martinez indicated to appellant that she was likely to be charged with a crime, although he was not sure how serious the charge would be:

> And you're gonna get charged because of what you did. So you need to understand that. Now, what we charge you with is gonna depend on how we know the case. Now right now what we know about what you did looks very bad. So if you'll explain to us then maybe we can lower it so you don't get charged with the worst charge possible.

In Agent Martinez's view, he was "trying to counsel her more than anything." He wanted "to impress upon her that there was serious evidence against her" but this was her chance to explain what happened. Agent Martinez denied that there was enough evidence to charge appellant prior to the interview. He also said that he did not "force her or coerce her or threaten her to talk to [the officers]."

However, both Agent Martinez and Sergeant Banks repeatedly made clear that, no matter what appellant told them during the interview, they were not going to arrest her. Sergeant Banks said:

> It doesn't matter what you tell me right now. I'm not gonna arrest you right now. Okay? I'm not here to arrest you. . . . I need to get your side, go back, talk to District Attorney and present everything. I, I still have evidence coming in. So I'm not prepared to do that. That's why when we get done talking today we're gonna leave. You're gonna stay here. You're gonna be free to do whatever you want. I'm not here to arrest you. . . . And once again, regardless of what you say . . . we are going to walk out the door and you're gonna stay inside when we get done. I'm not, I'm not gonna arrest you. I don't have a warrant.

Similarly, Agent Martinez assured appellant, "We're not here to arrest you."

Sergeant Banks agreed at the suppression hearing that he did not tell appellant she was free to leave because it would be a "weird thing to say," since she was lying in bed in her own apartment. Agent Martinez likewise testified that

28

appellant "could have asked us to leave or she could have left if she wanted." As the officers explained, they ordinarily tell suspects that they are free to leave when the noncustodial interview takes place at the police station.

The facts in this case are even less indicative of custody than those at issue in *Estrada*. The defendant in *Estrada* was subjected to a five-hour interrogation in a "coercive environment" after he was driven to the police station by an officer. *Estrada*, 313 S.W.3d at 294-95. The officers told the defendant he was the "central figure" in the murder investigation. *Id.* at 290. After accusing the defendant of lying, an officer said "the probable cause statement and the—and the arrest warrant" would state that the defendant was at the victim's house. *Id.* at 290-91. But the officers also told the defendant on several occasions he was free to leave, and the defendant stated several times that he wanted to leave and go home. *Id.* at 295. At the end of the interrogation, an officer told the defendant that they would drive him home but that a warrant would be issued for his arrest. *Id.* at 292. They took him home and then arrested him three hours later. *Id.* The court held that the defendant was not in custody for purposes of *Miranda*. *Id.* at 294.

Viewing the totality of the evidence discussed above and considering the *Estrada* decision, we hold that the record supports the trial court's conclusion that appellant was not in custody when she gave her June 19 statement. *See id.*

We hold that the trial court did not abuse its discretion in denying the motion to suppress the April and June statements, and we overrule appellant's second issue.

## Conclusion

Having overruled appellant's two issues, we affirm the trial court's judgment.

/s/     Kevin Jewell
Justice

Panel consists of Chief Justice Christopher and Justices Wise and Jewell.

Do Not Publish — Tex. R. App. P. 47.2(b).